UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DANNON ANES,

                Petitioner,                  Case No. 1:16-cv-233

v.                                           Honorable Robert J. Jonker

SHERMAN CAMPBELL,

                Respondent.

_____/

**REPORT AND RECOMMENDATION**

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  On May 18, 2012, an Allegan County Circuit Court jury, after a four day trial, convicted Petitioner of one count of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(f).  On July 23, 2012, the trial court sentenced Petitioner, as an habitual offender-fourth offense, MICH. COMP. LAWS § 769.12, to 240 to 380 months' imprisonment.  Petitioner is presently incarcerated at the Carson City Correctional Facility in Montcalm County, Michigan. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.      Prosecutor Misconduct during trial and closing argument / Ineffective assistance of counsel.

II.     Trial court abused its discretion, by denying the Defendant his rights to an impartial jury, by denying his challenges for cause.

III.    The trial court exclusion of evidence under the rape shield statute, did deprive [Petitioner], of his constitutional right to [fair] and impartial trial.

(Pet. 6-10, PageID.6-14.)  Respondent has filed an answer to the petition (ECF No. 8) stating that the grounds should be denied because they either are noncognizable state law claims, are procedurally defaulted, or have no merit.  Upon review and applying the AEDPA standards, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

On March 11, 2011, Petitioner met Theresa Price at a bar.  This was the first time the two had met.  When Ms. Price left the bar, she and Petitioner spoke again and she agreed to meet Petitioner later that night at her home.  Once there, Ms. Price made drinks for the two of them and they began kissing.  What began as consensual physical contact escalated to nonconsensual contact. During the encounter, Petitioner anally and vaginally penetrated Ms. Price with his penis.  When he was finished, Petitioner left Ms. Price's residence and Ms. Price called 911 to report she had been raped.  Petitioner was subsequently charged with two counts of CSC I, one each for the anal and genital penetration of Ms. Price, and was bound over for trial on the charges.  Petitioner was tried before a jury beginning on May 15, 2012 and concluding on May 18, 2012, when the jury found Petitioner guilty of the CSC I count for the anal penetration of Ms. Price and not guilty of the second CSC I count for the genital penetration of Ms. Price.[1]

Allegan County Sheriff Deputy Ross Mysliwiec, who worked on road patrol and as an evidence technician, testified that he was dispatched to Ms. Price's home at 3:13 a.m. on the

---

[1] The Court will refer to the transcripts of the trial proceedings as follows:

| Trial Transcript for May 15, 2012: | (Trial Tr. I, ECF No. 9-6, PageID.___) |
| Trial Transcript for May 16, 2012: | (Trial Tr. II, ECF No. 9-7, PageID.___) |
| Trial Transcript for May 17, 2012: | (Trial Tr. III, ECF No.9-8, PageID.___) |
| Trial Transcript for May 18, 2012: | (Trial Tr. IV, ECF No.9-9, PageID.___) |

morning of March 12, 2011, in order to assist in the collection of evidence from a possible criminal sexual conduct case.  (Trial Tr. II, ECF No. 9-7, PageID.725–726.)  He took pictures of the outside of Ms. Price's home, of tire tracks in the driveway, and of the living room and kitchen inside the residence. (*Id.* at PageID.726–730.)  After taking the photos, Deputy Mysliwiec proceeded to collect evidence which included a beer can that had been in the kitchen sink, the clothes that Ms. Price had been wearing that evening, and a pair of underwear and a paper towel that had a red stain on them. (*Id.* at PageID.730–731, 733-734.)  The deputy further noted that there were two areas on the living room carpet that appeared to contain blood.  (*Id.* at PageID.732.)  While he was collecting evidence, the deputy saw Ms. Price, and he testified that she appeared "visibly shaken and upset."  She was crying and very emotional.  She had a hard time speaking.  (*Id.* at PageID.738.)

Theresa Price testified that during March 11 and 12, 2011, she lived at her home in Allegan County with her two minor children.  (Trial Tr. II, ECF No. 9-7, PageID.788.)  On the evening of March 11, 2011, her children were with their father and Ms. Price met up with some of her girlfriends for a night out.  She began the evening at the Wooden Shoe Tap Room, and then went to Creekside, a Century Lanes bowling alley that also had a bar area.  (*Id.* at PageID.793-796.)  At Creekside, Ms. Price and her friends drank beer, sang karaoke, danced, and played pool.  (*Id.* at PageID.797-798.)  While she was dancing with her girlfriends, a man by the name of Chris (who was the boyfriend of  Ms. Price's friend Shawntay) asked whether the group would like to accompany him to another bar with two of his male friends (one of whom was Petitioner).  At that point, Ms. Price said she had a brief conversation with Petitioner on the dance floor.  She discovered that they both lived in the same town.  (*Id.* at PageID.802-803.) The group ultimately declined to go with Chris and his friends because they wanted to continue to sing karaoke and dance.  (*Id.* at PageID.798-

800.)  The three males then left, leaving Ms. Price and her friends at Creekside.  Sometime later,

Chris returned and told Ms. Price that Petitioner wanted her phone number.  Ms. Price indicated she

had a new phone and did not know how to use it, so Chris programed Petitioner's phone number into

her phone.  (*Id.* at 800-801.)  The night continued without incident, and at around 1:00 on the

morning of March 12, Ms. Price left and got into her car.  (*Id.* at PageID.811.)  Before she left the

parking lot, Petitioner drove up in a SUV next to her car and asked whether she would like to party

with him.  (*Id.* at 811-812.)  She declined, and he suggested getting a few drinks instead.  Ms. Price

accepted, and Petitioner said he would follow her to her residence.  (*Id.* at 812-813.)  She felt that

there was no reason not to feel safe with him, as he was a friend of a friend.  (*Id.* at 813-814.)

When they arrived at her home, Ms. Price went in to the kitchen to prepare some

drinks.  (*Id.* at PageID.815.)  Petitioner joined her in the kitchen, with his shirt off.  She noticed he

had a few tattoos, and they began to lightly kiss.  (*Id.* at PageID.817.)  Ms. Price then moved into the

living room, Petitioner followed her, and then he pushed her onto her stomach across a chaise that

was in the living room. (*Id.* at PageID.821.)  Ms. Price stated that almost immediately after pushing

her into the chaise, Petitioner took her pants off.  (*Id.* at PageID.824-826.)  He laid on top of her, and

she yelled at him to stop and tried to elbow him.  (*Id.* at PageID.827.)  Petitioner then penetrated her

with his penis, first through her vagina, and then through her anus.  (*Id.* at 828-829.)  She told him

to "stop", "no", and "don't do this".  (*Id.* at 830.)  Eventually, she was able to kick Petitioner in his

stomach, and Ms. Price told him to get out.  (*Id.* at PageID.831-832.)  He left, and Ms. Price saw

blood on the floor.  She locked the door and called 911.  (*Id.* at PageID.832-833.)

Ms. Price stated that since the incident she felt angry and humiliated, and had

difficulty sleeping.  (*Id.* at PageID.840.)  Ms. Price testified that she had not consented to allow

Petitioner to put his penis inside her vagina or anus.  She did not lead him on, or passionately kiss him.  (*Id.* at PageID.833-834.)

Next Cory Hunt, a sergeant with the Allegan County Sheriff's Department, testified. (Trial Tr. II, ECF No. 9-7, PageID.881.)  He stated that he was the first officer to arrive after Ms. Price called 911.  He testified that his first impression of Ms. Price was that she appeared to be very hysterical and was crying.  She made allegations about a rape or assault, and identified Petitioner by his first name.  (*Id.* at PageID.882, 886.)  When a female officer, Deputy Vandam, arrived, Sergeant Hunt stepped aside because of the nature of the allegations.  (*Id.* at PageID.883.)  Sergeant Hunt then testified that, sometime later, he became aware of a possible address where Petitioner might be located.  (*Id.* at PageID.887.)  Sergeant Hunt and two other officers went to the residence.  There the sergeant attempted to make contact with Petitioner, and knocked on the door for a period of thirty minutes.  (*Id.* at PageID.889-890.)  Thereafter an individual answered the door that the sergeant identified as being Petitioner.  (*Id.* at PageID.890-891.)  Officer Hunt testified that he was just ending his shift, so Petitioner was transported to the station by another deputy who was just beginning his shift.  Before placing Petitioner in the police car, however, Office Hunt performed a pat down search. He found a pair of boxer shorts in a pocket of Petitioner's clothing.  (*Id.* at PageID.891-892.)

Deputy Christine Vandam testified that she had experience and training for dealing with domestic assaults.  (Trial Tr. II, ECF No. 9-7, PageID.903-904.)  At around 3:13 a.m. on the morning of March 12, 2011, she was dispatched to Ms. Price's residence.  When she arrived, there were a few other units on scene who had arrived just a few minutes earlier.  She testified that the first thing she noticed was a hysterical female in the kitchen and blood on the carpet between two chairs. (*Id.* at PageID.905-906.)  Deputy Vandam testified that it took several minutes to get Ms. Price calm

enough so that she could talk.  (*Id.* at PageID.907.)  Ms. Price used the bathroom, and the deputy testified she saw a substance she thought was blood in the toilet.  (*Id.* at PageID.910.)  Deputy Vandam then recounted the statement she received from Ms. Price.  The statement generally tracked Ms. Price's testimony.  (*Id.* at PageID.913-914.)  Ms. Price also told the deputy she had received a number of phone calls from Petitioner, and that she must have received them while she was at the bar.  (*Id.* at PageID.917–918.)

Next, Detective Chris Haverdink testified.  (Trial Tr. III, ECF No. 9-8, PageID.946.) He stated that he was dispatched to Ms. Price's residence at approximately 3:30 a.m. on March 12, 2011.  When he arrived, he saw Ms. Price who was physically upset and shaken.  (*Id.* at PageID.947–948.)  The detective called the Center for Women in Transition in order to arrange an examination for Ms. Price.  (*Id.* at 950.)   After that, the detective testified he was able to obtain a possible location where Petitioner might be found.  He testified that he had Petitioner's first name and phone number, and used that information to search a computer system that resulted in a possible address.  (*Id.* at PageID.951.)  He went with Sergeant Hunt and Officer VanderPloeg to the address. Consistent with Sergeant Hunt's testimony, Detective Haverdink testified that it was roughly a half hour before Petitioner answered the door.  (*Id.* at PageID.952.)   Thereafter, he retrieved the completed rape kit from the Center for Women in Transition, and placed it in the evidence room at the Sheriff's Department. (*Id.* at PageID.953.) Detective Haverdink further testified that he obtained a "buckle swab" of DNA evidence from the inside of Petitioner's cheek on October 5, 2011.  (*Id.* at PageID.954.)

Nurse Julie Mascorro testified that she performed an examination of Ms. Price at the Center for Women in Transition on March 12, 2011.  (Trial Tr. III, ECF No.9-8, PageID.971-972.)

She found Ms. Price to be crying and visibly upset.  (*Id.* at PageID.972.)  Ms. Price told her that she had met an individual at a bar, went home with him, and that she had been assaulted by being vaginally and anally penetrated from behind.  (*Id.* at PageID.973–974.)  On exam, Ms. Price complained of pain in the rectal area.  (*Id.* at PageID.978.)  Ms. Mascorro's exam revealed abrasions and lacerations.  (*Id.* at PageID.998-1000.)  She testified that the injuries were consistent with forced penetration of the anus.  (*Id.* at PageID.1006.)  During the examination, Ms. Mascorro collected oral and genital swabs and placed them in a rape kit.  (*Id.* at PageID.1009-1010.)

Dr. Rebecca VanVolkenburg testified that she was a primary care physician who delivered babies and performed surgeries, including hysterectomies.  (Trial Tr. III, ECF No. 9-8, PageID.1044.)  On January 17, 2011, Dr. VanVolkenburg performed a hysterectomy on Ms. Price.  (*Id.* at PageID.1045-1046.)  On March 14, 2011, Ms. Price called the doctor's office and stated she had been raped and wanted to be seen for an appointment.  (*Id.* at PageID.1050-1051.)  At the examination, Ms. Price appeared to be tearful and anxious.  (*Id*. at PageID.1051.)  Ms. Price wanted to know if she could have been injured because of her recent surgery.  The doctor indicated she did not believe so, but performed an examination just in case, which revealed no injury to the surgical incision.  (*Id.* at PageID.1052.)

Ms. Price's father, Richard Hardy, testified that he received a call from his daughter during the early morning of March 12, 2011.  (Trial Tr. III, ECF No. 9-8, PageID.1076.)  She was crying as she told him she had just been raped.  (*Id.*)  He met his daughter at the Center for Women in Transition.  (*Id.* at PageID.1078.)  Mr. Hardy thought that his daughter looked like she was ready to faint because she was crying so hard.  (*Id.* at PageID.1079.)  After the examination, his daughter returned to her house, and Mr. Hardy went there early that morning.  He saw what appeared to be

blood on the carpet in the living room, and cleaned the spots with some carpet cleaner.  (*Id.* at PageID.1081.)  He also installed a peep-hole in his daughter's front door.  (*Id.* at PageID.1082.) Since the incident, he stated that his daughter was not as happy and "go lucky" as she had once been. (*Id.* at PageID.1083.)

Ann Hunt, who was qualified as an expert in DNA analysis, testified that she tested the contents of the rape kit from the Center for Women in Transition.  (Trial Tr. III, ECF No. 9-8, PageID.1092-1094.)  Ms. Hunt testified that when comparing DNA samples, she would look at and compare sixteen different areas of a DNA molecule.  She looked at those areas because those areas tended to show a high variation between individuals in a population.  (*Id.* at PageID.1089.)  Ms. Hunt tested the evidence from the rape kit against a known DNA sample taken from Petitioner  (*Id.* at PageID.1097-1099.)  Of the sixteen areas she looked at, she found a match between Petitioner and the evidence from the rape kit at ten points, Petitioner could not be excluded as a match at three other areas, and at the last three areas the results were inconclusive.  (*Id.* at PageID.1100.)  Ms. Hunt performed a statistical analysis of those results and concluded that in the Caucasian population, the probability of selecting an unrelated individual at random that would match the DNA types from the rape kit was 1 in 276.1 million.  (*Id.* at PageID.1100-1101.)

Connie Black-Pond testified as an expert in the area of behavior of adult sexual assault victims.  (Trial Tr. III, ECF No. 9-8, PageID.1133.)  She testified that adult sexual assault victims typically experience a significant amount of confusion, shock, and embarrassment.  They may blame themselves and take responsibility for some of what has happened.  (*Id.* at PageID.1134.) A victim may also be very emotional, and the assault would tend to affect their self-confidence and esteem.  (*Id.* at PageID.1134.)  She also testified that during an assault, some victims would not fight,

but would have a passive reaction. She testified that this could be because they were overpowered, or felt it was impossible to escape and move. It could also be a survival mechanism that allowed the victims to get past the event. (*Id.* at PageID.1135-1136.)

Tammy Hemminger testified that she was friends with Theresa Price. (Trial Tr. III, ECF No. 9-8, PageID.1141.) On March 11, 2011, the two went out to sing karaoke. (*Id.* at PageID.1141.) They went over to Creekside to shoot pool, dance, and sing some more karaoke. (*Id.* at PageID.1141-1142.) During the evening, she did not observe Ms. Price behaving in any unusual manner toward any male, and did not observe her with any particular male. (*Id.*)

Ricardo Martinez testified that he answered 911 calls for Allegan County. (Trial Tr. IV, ECF No.9-9, PageID.1155.) On March 12, 2011, around 3:13 a.m., he received a 911 call from Theresa Price. (*Id.*) He testified that Ms. Price sounded stressed, and she reported that she had just been raped. (*Id.* at PageID.1156.) The prosecution then played the 911 call, the contents of which were not published in the trial transcript. (*Id.* at PageID.1160.) Thereafter, the prosecution rested. (*Id.* at PageID.1169.)

The defense presentation painted the encounter between Petitioner and Theresa Price as entirely consensual. Christopher Holtsclaw testified that on the evening of March 11, 2011, he and Petitioner had a few beers at his home. (Trial Tr. IV, ECF No. 9-9, PageID.1182.) The two received a call from Chris Clandening who was at the Creekside bar with his girlfriend Shawntay Frasier. (*Id.* at PageID.1183.) Chris Clandening invited Chris Holtsclaw and Petitioner to join them at the Creekside bar. (*Id.*) Chris and Petitioner decided to go to the bar, and when the two arrived they ordered a pitcher of beer and joined Chris Clandening and Shawntay at a table. At the other end of the table Theresa Price was sitting with a few of her friends. (*Id.* at PageID.1184.) Chris

Holtsclaw testified that the evening proceeded much differently than as it had been presented during the prosecution's case.  Instead of only briefly chatting with Petitioner while at Creekside, Chris Holtsclaw stated that Theresa went to their end of the table "a few times" and put her arms around Petitioner.  She twice pulled Petitioner out onto the dance floor.  (*Id.* at PageID.1185.)  Around 1:15 or 1:30 a.m., the bar was closing, and Chris testified that he left with Petitioner to go to Petitioner's truck.  (*Id.* at PageID.1187.)  Petitioner then ran back inside the bar in order to speak with Chris Clandening.  When he came back out from the bar, Petitioner was texting on his phone.  (*Id.*)  Chris Holtsclaw then testified he saw Ms. Price leave the bar, and saw Petitioner walk over and speak with her by her car. (*Id.*)  At that point, Chris Holtsclaw's girlfriend arrived to pick him up, and Chris told Petitioner he was leaving.  (*Id.*)

Dannon Anes then took the stand to testify on his own behalf.  He stated that on March 11, 2011, he was drinking beers with Chris Holtsclaw in Chris's garage.  (Trial Tr. IV, ECF No. 9-9, PageID.1206.)  He and Chris Holtsclaw drove to the Creekside bar after Chris Clandening invited them.  (*Id.* at PageID.1206-1207.)  When they arrived, they ordered a pitcher of beer and hung out with Chris Clandening and his girlfriend Shawntay.  (*Id.* at PageID.1207.)  Shortly after they got there, Chris Clandening and Shawntay introduced him to Theresa Price.  (*Id.* at PageID.1209.) Later that evening Jessica Spencer, the mother of Petitioner's then unborn son, called Petitioner to say she wanted to see him.  (*Id.* at PageID.1210.)  Petitioner testified he went outside to smoke with Jessica, and they were joined with a few others, including Ms. Price.  (*Id.* at PageID.1210-1211.)  Petitioner then walked Ms. Spencer to her car and said goodnight, and then he walked back inside the bar.  (*Id.* at PageID.1211.)  Petitioner testified he continued to drink and hang out with Shawntay, Chris Clandening and Chris Holtsclaw.  Ms. Price also joined them a few times,

and pulled Petitioner out onto the dance floor a couple of times.  (*Id.* at PageID.1212.)  During this time, Chris Clandening and Shawntay took Petitioner's phone and programmed Ms. Price's number into it.  They also took Ms. Price's phone and put Petitioner's number in it.  (*Id.* at PageID.1214.)  Petitioner testified that his friends wanted him to hook up with someone because he was having trouble with Jessica Spencer.  (*Id.* at PageID.1214-1215.)

When the bar closed, Petitioner and Chris Holtsclaw went to Petitioner's truck.  Petitioner then went back inside to try and talk to Chris Clandening to learn more about an after-party.  (*Id.* at PageID.1216-1217.)  Petitioner then came back outside after being unable to find Chris Clandening.  He then texted Theresa Price, and she walked out of the bar.  Petitioner got out of his truck and walked over to her car.  (*Id.* at PageID.1218.)  Petitioner asked if she wanted to go to the after-party and she declined.  Instead, Ms. Price suggested that he could go home with her for some drinks if he wanted.  (*Id.* at PageID.1218-1219.)  Petitioner agreed, and drove behind her to her house.  (*Id.* at PageID.1219.)  Once they arrived, Ms. Price began preparing the drinks, and Petitioner called Chris Clandening to make plans to hang out with him, Shawntay, and Theresa the next day.  (*Id.* at PageID.1222.)  After making the plans, Petitioner and Theresa started talking, and she asked about his tattoos.  He took off his shirt to show them to her.  (*Id.* at PageID.1223.)  They then began kissing and rubbing against each other.  (*Id.* at PageID.1224.)  Ms. Price then turned around and pulled her pants down and walked over to the chaise lounge in the living room.  (*Id.* at PageID.1226.)  Petitioner also removed his clothing.  (*Id.* at PageID.1229.)  He then testified they had consensual sex on the chaise lounge.  (*Id.*)  He testified they were going pretty fast, and that at some point he penetrated her anus.  She stated "no" and that "it hurts".  Petitioner testified that he immediately stopped, but that after a while they moved to the floor and continued to have sex.  (*Id.* at

- 11 -

PageID.1231.)  After they finished, Petitioner put his clothes back on.  He couldn't find his boxers, and she helped him find them.  (*Id.* at PageID.1232-33.)  Ms. Price then told Petitioner he could leave.  He asked what was wrong, and she said nothing, but that he needed to leave.  (*Id.* at PageID.1233.)  He said she had a sour look on her face, but was not crying or upset.  (*Id.* at PageID.1235.)  He got in his truck, went home, and fell asleep.  (*Id.* at PageID.1235-1236.)  He woke up when the police arrived.  (*Id.* at PageID.1236.)  The defense then rested.

After one hour and forty-nine minutes of deliberation, the jury returned a guilty verdict on count one, and a not-guilty verdict on count two.   (Trial Tr. IV, ECF No. 9-9, PageID.1335-1336.)

At the July 23, 2012, sentencing hearing the trial court noted that it had amended the proposed offense variables (OV) and prior record variables (PRV) as scored by the department of corrections.  The Court decreased OV 3 from 10 points to 5 points, and decreased OV 13 from 25 to 0.  (Sentencing Hr'g, ECF No. 9-10, PageID.1344-1345.)  The minimum guideline range thus fell at 108 to 360 months.  (*Id.* at PageID.1345.)  The trial court subsequently sentenced Petitioner to a term of imprisonment of 240 months to 380 months with credit for 499 days of time served.  (*Id.* at 1365.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals, raising the same three issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 9-11, PageID.1387.)   By unpublished opinion issued on February 13, 2014, the Michigan Court of Appeals affirmed Petitioner's convictions and sentences.  (*See* 2/13/13 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 9-11, PageID.1370-1375.)

- 12 -

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court, raising the same three grounds presented to and rejected by the Michigan Court of Appeals. By order entered May 20, 2015, the Michigan Supreme Court denied his application for leave to appeal, because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., ECF No. 9-14, PageID.1710.)

Petitioner did not appeal to the United States Supreme Court or seek collateral review.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state

court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.  Prosecutorial Misconduct & Ineffective Assistance

Petitioner contends that his trial was rendered unfair by several instances of prosecutorial misconduct made during the prosecution's closing statement.  He claims that the prosecutor improperly vouched for the credibility of Theresa Price and also erred by telling the jury that Petitioner was lying.  Petitioner further argues his trial counsel was ineffective for failing to object to the alleged misconduct.

#### A.    Prosecutorial Misconduct

Misconduct by a prosecutor can rise to the level of a due process violation.  *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989).  However, before habeas corpus relief becomes available, the misconduct must be so egregious as to deny the petitioner a fundamentally fair trial.  *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993).  In other words, for relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Prosecutors "must be given leeway to argue reasonable inferences from the evidence."  *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)); *see also Bales v. Bell*, 788 F.3d 568 (6th Cir. 2015) (upholding on habeas review the state court's decision that the prosecutor's numerous improper statements during closing argument did not undermine the fundamental fairness of petitioner's trial).

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v.*

*Phillips*, 455 U.S. 209, 219 (1982).  The Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process:  (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court.  *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Respondent contends that Petitioner has procedurally defaulted this claim.  (Resp't Answer in Opp'n, ECF No. 8, PageID.230.)  Respondent correctly notes that if a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review.  *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010).  Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to

exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Proceeding, then, to the merits, the federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). *But see Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).

In his brief to the Michigan Court of Appeals, Petitioner claimed the following statements made by the prosecution during the closing arguments constituted impermissible vouching for Ms. Price:

"Why is she admitting to certain things? Because she's telling the truth, that's why" (Trial Tr. IV, ECF No. 9-9, PageID.1278.)

"If she were lying why would she tell her daughter this? She wouldn't. She's telling the truth. She has no motive to lie, none." (*Id.* at PageID.1284.)

- 18 -

> "Imagine how humiliating and embarrassing that is.  Why would she be doing this?  There's no reason except she's telling the truth.  (*Id.* at PageID.1288.)

Petitioner also cited the following statements made by the prosecution regarding his testimony as

evidence of alleged misconduct:

> "So we have him testifying.  He was lying.  My argument to you is when he was testifying to you he was lying."  (*Id.* at PageID.1289.)

> "He didn't think it was important, didn't – I mean you're there, you're being questioned about this incident, the main issue is did she consent or not.  He doesn't tell them that.  He's telling us that for the first time today.  Because he's lying."  (*Id.* at PageID.1290.)

> "He gets to sit here, he gets to listen to all of the testimony, he has all the police reports, he's had a year and two months to figure out his story.  He's lying to you."  (*Id.* at PageID.1291.)

Petitioner claims the above statements denied him a fair trial. The Michigan Court of Appeals held

otherwise:

> On appeal, defendant first argues that the prosecutor committed misconduct during her closing argument by vouching for the victim's credibility and telling the jury that defendant was lying. We disagree. "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009). "[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). A defendant pressing an unpreserved claim of prosecutorial misconduct "must show a plain error that affected substantial rights, and the reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Parker*, 288 Mich App 500, 509; 795 NW2d 596 (2010).

> "The prosecutor cannot vouch for the credibility of a witness or suggest that she has some special knowledge concerning a witness's truthfulness." *People v Laidler*, 291 Mich App 199, 201; 804 NW2d 866 (2010), rev'd on other grounds 491 Mich 339 (2012). "The danger is that the jury will be persuaded by the implication that the prosecutor has knowledge that the jury does not and decide the case on this basis rather than on the evidence presented." *Bennett*, 290 Mich App at 477. However,

- 19 -

"[p]rosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) (citations omitted).

Here, the prosecutor repeatedly stated that the victim was telling the truth and that defendant was lying. Reviewing the record and the full context of the prosecutor's challenged statements, however, it is apparent that her statements relied on evidence admitted at trial and reasonable inferences arising therefrom that were consistent with the prosecution's theory that the victim did not consent to defendant's sexual conduct. *Id*. Moreover, with regard to the prosecutor's vouching for the victim's credibility, "a prosecutor may comment on his or her own witnesses' credibility, especially when credibility is at issue. The prosecutor is free to argue from the evidence and its reasonable inferences in support of a witness's credibility." *Bennett*, 290 Mich App at 478. And with respect to the prosecutor's statements that defendant was lying, where a defendant takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness . . . ." *People v Fields*, 450 Mich 94, 110; 538 NW2d 356 (1995) (internal quotation omitted). Prosecutors are not required to confine argument to the blandest of possible terms, and in fact may use colorful rhetoric when making arguments. *People v Fyda*, 288 Mich App 446, 462; 793 NW2d 712 (2010). Thus, defendant has not shown that the prosecutor's closing argument constituted misconduct and plain error. Furthermore, the trial court instructed the jury to limit its consideration to the evidence properly before it and that the attorneys' statements and arguments were not evidence. Thus, defendant has not shown that any misconduct regarding the prosecutor's closing argument affected his substantial rights. *People v Long*, 246 Mich App 582, 588; 633 NW2d 843 (2001).

(MCOA Op. ECF No. 9-11, PageID.1370-1371.) The Court of Appeals' decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Nor was it a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). To the contrary, it is entirely consistent with federal law.

Petitioner's claim does not meet the high standard to establish a due process violation through improper vouching for a witness. These statements were permissible because they were all directed towards convincing the jury that Ms. Price was more credible than Petitioner. It is

- 20 -

appropriate for the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable inferences, and examine the motives witnesses may have for lying.  *See Cantrell v. Gray*, No. 84-3686, 1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1986); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995); *Kappos v. Hanks*, 54 F.3d 365, 368 (7th Cir. 1995).  Moreover, instructing a jury that the arguments are not evidence has sometimes been deemed to cure any improprieties in a closing argument.  *Byrd*, 209 F.3d at 538.  Further, instructing the jury regarding the methods it should use to evaluate credibility helps to cure any improprieties.  *Id.*  In this action, the court gave both instructions.  (*See* Trial Tr. IV, ECF No. 9-9, PageID.1311-1315.)  Consequently, Petitioner's prosecutorial misconduct claim does not rise to the level of a constitutional violation.[2]

> B.     *Ineffective Assistance*

Petitioner next contends his counsel was ineffective for failing to object to the above quoted statements during the prosecution's closing argument.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that

---

[2] In his petition, Petitioner provides a laundry list of further assertions regarding prosecutorial misconduct. (Pet., ECF No. 1, PageID.7.)  All these contentions relate to the pretrial period, and beyond the bare bones allegations, Petitioner provides no effort at developing an argument.  It is plain that these claims are unexhausted.  The Court is permitted to deny unexhausted claims though. 28 U.S.C. § 2254(b)(2).  Even taking Petitioner's contentions as true, none of them relate to the trial itself.  As such, Petitioner cannot show that the alleged misconduct denied him a fundamentally fair trial.  *See Serra*, 4 F.3d at 1355.

counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals found that Petitioner could not succeed on this claim:

> Defendant next argues that his trial counsel was ineffective for failing to object to the alleged acts of prosecutorial misconduct during the prosecutor's closing argument. Given that the prosecutor's challenged statements were not improper and did not

> constitute misconduct, defense counsel was "not ineffective for failing to make a futile objection." *People v Chambers*, 277 Mich App 1, 11; 742 NW2d 610 (2007); *Laidler*, 291 Mich App at 202 ("[B]ecause the prosecution's argument was not improper, defense counsel was not ineffective for failing to  object. Counsel is not ineffective for failing to raise a meritless objection.").

(MCOA Op., ECF No. 9-11, PageID.1371.)  The Court of Appeal's decision is entirely consistent with the *Strickland* standard and its progeny and easily survives scrutiny under the doubly deferential standard of review.  Because Petitioner's prosecutorial misconduct claim lacks merit, any objection made by his attorney would have been futile.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

For all the above reasons, Petitioner's first ground for habeas relief should be denied.

## II.    Juror Bias.

Petitioner next argues that he was denied a fair and impartial jury.  During *voir dire*, it was discovered that several of the prospective jury members had previously served, only two weeks earlier, on one of two unrelated criminal sexual conduct trials in Allegan County Circuit Court.  One of these trials involved the same presiding judicial officer and prosecuting attorney and further involved testimony from an expert witness who also testified in Petitioner's trial.  Petitioner's trial attorney challenged these prospective jurors on the grounds that they could not be impartial jurors.  The trial court denied Petitioner's challenge, but allowed Petitioner's attorney to question the jurors on their prior experience.  Several of these prospective jurors were ultimately selected as jurors in Petitioner's case.  In this claim of error, Petitioner first contends that these jurors should have been removed from the jury and that the trial court's failure to grant his challenge for cause

deprived him of his right to a fair and impartial jury.  Secondly, Petitioner argues that the inclusion of an individual on the jury who admitted to being a victim of sexual abuse as a child also violated his right to a fair and impartial jury.  Petitioner's arguments fail on the merits.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."  U.S. Const. amend. VI.  The right to an impartial jury is applicable to the states via the Fourteenth Amendment.  *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."  *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).  "The *voir dire* is designed "'to protect [this] right by exposing possible biases, both known and unknown, on the part of potential jurors.'"  *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).  When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'"  *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis*, 354 F.3d at 520 (citing *Patton*, 467 U.S. 1025, 1036 (1984)); *see also Sizemore v. Fletcher*, 921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). A state court decision based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state court proceeding and not

- 24 -

simply erroneous or incorrect. *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams*, 529 U.S. at 409-11); *see also Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). The state court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

> A.    *Same Issue Jurors*

The Michigan Court of Appeals resolved Petitioner's challenge regarding the jurors who had earlier sat on a criminal sexual conduct trial as follows:

> Defendant next argues that he is entitled to a new trial on the basis that he was denied his right to a fair and impartial jury. We disagree. We review "for abuse of discretion a trial court's rulings on challenges for cause based on bias." *People v Williams*, 241 Mich App 519, 521; 616 NW2d 710 (2000). "An abuse of discretion occurs only when the trial court chooses an outcome falling outside the principled range of outcomes." *People v Miller*, 482 Mich 540; 759 NW2d 850 (2008) (quotation and alteration removed). "However, to the extent our analysis involves interpretation of a court rule, our review is de novo." *People v Eccles*, 260 Mich App 379, 382; 677 NW2d 76 (2004).

> A criminal defendant has a constitutional right to be tried by a fair and impartial jury. US Const, Am VI; Const 1963, art 1, § 20. "However, . . . jurors are presumed to be . . . impartial, until the contrary is shown. The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Miller*, 482 Mich at 550 (citation and quotation omitted). "A prospective juror is subject to challenge for cause on any ground set forth in MCR 2.511(D)[.]" MCR 6.412. MCR 2.511(D)(6) provides: "It is grounds for a challenge for cause that the person . . . has already sat on a trial of the same issue[.]"

> During voir dire, it was revealed that a number of the potential jurors served on one of two recent cases involving CSC charges. The record indicates that two cases progressed "almost simultaneously" and both concluded approximately two weeks before defendant's trial began on May 15, 2012. Defense counsel argued that all of the jurors who served on one of the two previous cases should be excused for cause under MCR 2.511(D)(6) because those jurors "already sat on a trial of the same issue." The trial court denied defendant's challenge for cause, finding that neither of the two previous cases amounted to "a trial of the same issue" pursuant to MCR 2.511(D)(6). In so finding, the trial court noted that the two previous cases involved different CSC charges (CSC II and CSC III, respectively) and significantly different

facts, and that neither previous case involved the issue of consent, which was dispositive to defendant's case.

MCR 2.511(D) does not define the term "same issue;" and this Court did not find any authority interpreting or applying MCR 2.511(D)(6).

> When called on to construe a court rule, this Court applies the legal principles that govern the construction and application of statutes. Accordingly, the rule at issue here must be construed in accordance with the ordinary and approved usage of the language employed, and in light of its purpose and the object to be accomplished by its operation. [*Eccles*, 260 Mich App at 382 (citation and quotations omitted).]

"In ascertaining the meanings of words, this Court may refer to dictionaries for guidance." *People v DeKorte*, 233 Mich App 564, 569; 593 NW2d 203 (1999). Random House Webster's College Dictionary provides the following definition of "issue:" "a point in question or a matter that is in dispute." *Random House Webster's College Dictionary* (2000). Moreover, this Court must construe the language of MCR 2.511(D)(6) "in light of its purpose and the object to be accomplished by its operation." *Eccles*, 260 Mich App at 382. In *Eccles*, we explained the purpose of permitting a challenge for cause under the grounds listed in MCR 2.511(D):

> The . . . grounds listed in MCR 2.511(D) on which a party may challenge a juror for cause fall into two principal categories. The first is that the person is not statutorily qualified to act as a juror. The second is that the juror is biased, *i.e.,* that the juror has preconceived opinions or prejudices, or such other interest or limitations as would impair his or her capacity to render a fair and impartial verdict. [*Id*. (quotation omitted).]

The dictionary definition of "issue" supports the trial court's finding that neither of the two previous cases involved the same issue as the present case because neither previous case involved the dispositive question of consent that was center to this case or involved CSC I charges. Moreover, in light of the purpose of permitting a challenge for cause under MCR 2.511(D), which is to exclude a juror who "has preconceived opinions or prejudices," it is reasonable to focus on whether the question or matter in dispute is similar between the two cases. See *Eccles*, 260 Mich App at 382 (citation and quotations omitted).

Moreover, even if we found that the trial court abused its discretion by denying defendant's challenge for cause, defendant is not entitled to relief absent a showing that this error prejudiced his right to a fair and impartial jury. In *Miller*, 482 Mich at

546, our Supreme Court addressed whether the defendant was "entitled to a new trial as a result of" a "convicted felon having served on his jury" to contrary MCL 600.1307a(1). The Supreme Court held:

> Although a criminal defendant has a constitutional right to be tried by an impartial jury, a criminal defendant does not have a constitutional right to be tried by a jury free of convicted felons. Instead, the right to a jury free of convicted felons is granted by statute. And by statute, a violation of this 'right' only requires a new trial if the defendant demonstrates that such a violation 'actual[ly] prejudice[d]' him. MCL 600.1354(1). [*Miller*, 482 Mich at 547-548 (citations and footnote omitted).]

Here, defendant provides no authority supporting that he had a constitutional right to be tried by a jury free of jurors who have already sat on a trial involving the same issue; rather, defendant's right to a jury free of jurors who have "already sat on a trial of the same issue" is granted by court rule, i.e., MCR 2.511(D)(6). Thus, under the reasoning of our Supreme Court, we look to the court rules to determine the proper remedial standard to apply to a violation of MCR 2.511(D)(6). *Id.* MCR 2.613(A) provides that "an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial . . . unless refusal to take this action appears to the court inconsistent with substantial justice." Here, all of the potential jurors who served on either of the two previous trials testified that they could be impartial. Nothing in the record indicates that these jurors' previous jury service prevented them from being fair and impartial when trying defendant's case. Accordingly, this Court would not grant defendant a new trial for any error related to the jury herein. MCR 2.613(A). See *Miller*, 482 Mich at 553-554.

(MCOA Op. ECF No. 9-11, PageID.1371-1373.)

To the extent that Petitioner is arguing that the trial court judge failed to comply with provisions of Michigan Court Rule 2.511(d), such a claim is non-cognizable on federal habeas review.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).

- 27 -

The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

The constitutional issue presented is whether the trial court should have struck for cause those jurors who had served on a jury two weeks earlier because the jurors could not be impartial. When a juror is challenged as biased and partial, the court must consider factually whether the juror swore he or she could set aside any personal opinion she might hold and decide the case on the evidence presented, and the court must consider whether the juror's claim of impartiality should be believed. *Patton*, 467 U.S. at 1036. "[A] trial court's finding that a juror was impartial is entitled to a presumption of correctness, rebuttable only upon a showing of clear and convincing evidence." *Dennis*, 354 F.3d at 520; *Patton* at 1036. The trial court took extensive pains to ensure the these prospective jurors could be impartial and allowed Petitioner's trial counsel to question them directly on whether their prior service had any bearing on their ability to be impartial. All of these potential jurors responded that they could be impartial. (Trial Tr. I, ECF No. 9-6, PageID.593-623.) Under these circumstances, the Michigan Court of Appeals decision was not unreasonable.

B.     *Juror Who Had Been a Victim of Childhood Abuse.*

Under questioning by the trial court during *voir dire*, a potential juror stated that she had been a victim of childhood sexual abuse. (Trial Tr., ECF No. 9-6, PageID.669-671.) Though Petitioner's attorney questioned the potential juror, he did not challenge the juror for cause or

- 28 -

exercise one of the defense's peremptory challenges to excuse the juror.  The prosecution also did not seek to exclude the potential juror, and as such, the potential juror ended up as a member of the jury.  Petitioner now argues that the inclusion of this juror violated his right to a fair and impartial jury.  The Michigan Court of Appeals, however, found that Petitioner had abandoned this claim:

> Defendant also appears to raise a claim of error regarding a juror who was a victim of sexual abuse as a child. This argument is meritless. During voir dire, the juror testified that she "could judge fairly" and that she did not have any predisposed inclination in favor of the prosecution. Defense counsel did not try to excuse the juror for cause or use a peremptory challenge. On appeal, defendant simply provides a conclusory statement that "due to juror [ 's] history as a victim of sexual misconduct, [] she could not be fair and impartial in this case and should have been removed." Defendant provides no further articulation regarding this contention and fails to cite any supporting authority. Accordingly, defendant has abandoned any argument regarding the juror. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Schumacher*, 276 Mich App 165, 178; 740 NW2d 534 (2007) (alteration in original; quotations omitted).

(MCOA Op., ECF No. 9-11, PageID.1374.)  In denying Petitioner's claim, the Michigan Court of Appeals expressly relied on its rule requiring that, in order to obtain consideration of a claim on appeal, an appellant may not merely state that claim in his appellate brief.  Unless an appellant provides facts, citations, and arguments in support of the claim, it will be deemed abandoned. *People v. Coy*, 669 N.W.2d 831, 843 (Mich. Ct. App. 2003).  It is clear that the rule requiring development of appellate issues was well-established at the time of Petitioner's trial.  *See, e.g.*, MICH. CT. R. 7.212(C)(6)-(7) (setting forth requirements for appellate briefs, including the requirements of sufficient factual descriptions to understand the controversy and question involved and for arguments including supporting authorities); *Coy*, 669 N.W.2d at 843; *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995); *Froling v. Carpenter*, 512 N.W.2d 6, 9 (Mich. Ct. App. 1993).

Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, developing his issue on appeal, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986). Petitioner, however, has not done so.

But even if Petitioner had not procedurally defaulted his claim, the claim would be meritless. According to the Michigan Court of Appeals, the record showed that the juror had agreed to set aside bias. That court found the juror's statement of impartiality to be credible. Petitioner offers nothing to counter that finding other than his bare assertion that the juror's statement regarding impartiality was not credible. That is certainly not clear and convincing evidence of the juror's bias. Therefore, the Michigan Court of Appeals decision was not unreasonable.

### III.    Exclusion of Certain Evidence

In his third ground for habeas relief, Petitioner complains that the trial court erred when it excluded testimony about Theresa Price's behavior at the Creekside bar on the night in question. Petitioner also sought to admit evidence that Ms. Price assaulted the mother of Petitioner's child sometime after the night in question. Petitioner claims that both the testimony regarding Ms. Price's behavior and the evidence of the assault was relevant to establish that his interactions with Ms. Price on the night of March 11, 2011, were entirely consensual.

Petitioner first argues that the evidence was improperly excluded under Michigan's Rape Shield Law, MICH. COMP. LAWS § 750.520j as well as Michigan Rule of Evidence 403. The

Michigan Court of Appeals found that Petitioner had abandoned both arguments.  (MCOA Op. ECF No. 9-11, PageID.1374-1375.)   For reasons similar to those stated in the above discussion of Petitioner's second ground for habeas relief, Petitioner accordingly would be required to show cause and prejudice in order to proceed with this ground for habeas relief.  But, as is also noted above, the Court is permitted to bypass the procedural default analysis.  Here, to the extent Petitioner argues the application of the Michigan Rape Shield Law and a state rule of evidence were improper, his claim is not cognizable on habeas review.  *See Estelle*, 502 U.S. at 67–68 (noting that an inquiry into whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions").

Petitioner next argues that exclusion of the evidence violated the Confrontation Clause.   The Michigan Court of Appeals addressed this claim on the merits:

> Defendant offers a general argument that precluding evidence of the victim's behavior toward defendant on the night in question violated his right to confront the victim. Our Supreme Court stated that, "in certain limited situations," the admission of evidence of a victim's sexual conduct "may be required to preserve a defendant's constitutional right to confrontation." *People v Hackett*, 421 Mich 338, 348; 365 NW2d 120 (1984). Our Supreme Court enumerated specific instances in which the evidence of a victim's sexual conduct may be admissible even if it is not allowed under the language of the rape-shield statute:
>
> For example, where the defendant proffers evidence of a complainant's prior sexual conduct for the narrow purpose of showing the complaining witness' bias, this would almost always be material and should be admitted. Moreover in certain circumstances, evidence of a complainant's sexual conduct may also be probative of a complainant's ulterior motive for making a false charge. Additionally, the defendant should be permitted to show that the complainant has made false accusations of rape in the past. [*Id*. at 348-349.]
>
> However, none of the instances enumerated in *Hackett*, apply to the present case. Defendant did not proffer the challenged evidence to show the victim's bias or her

- 31 -

"ulterior motive for making a false charge[;]" and the evidence did not support that the victim had "made false accusations of rape in the past." *Id*. Furthermore, the proffered evidence of the victim's behavior toward defendant at the bar would presumably go to her testimony that she did not consent to defendant's sexual conduct later that night. At trial, defendant was permitted to present evidence that the victim was flirtatious and physically affectionate toward him at the bar. Ultimately, defendant has not shown that the trial court abused its discretion by precluding the challenged evidence or that this ruling violated his right to confront the victim.

(MCOA Op., ECF No. 9-11, PageID.1375.)

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. CONST., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment). The Supreme Court long has read this right as securing an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895), and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). As the Supreme Court early held,

> The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Mattox*, 156 U.S. at 242-43, *quoted in California v. Green*, 399 U.S. 149, 157-58 (1970). While the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee "'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is

concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see also United States v. Adams*, 722 F.3d 788, 834 (6th Cir. 2013); *King v. Trippett*, 192 F.3d 517, 524 (6th Cir. 1999). The Michigan Court of Appeals decision is entirely consistent with this authority and accordingly it cannot be said that the decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. This ground for habeas relief should be rejected.

### Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying

this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that a certificate of appealability should be denied.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  June 26, 2017                             /s/ Ray Kent
                                                  RAY KENT
                                                  United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).